This is a case that was initiated by an action on June 19, 2001, at the Vietnamese embassy in Bangkok, Thailand, where two what turned out to be inoperative bombs were placed. Mr. Vo has not denied being responsible for that action, although there is evidence that he was involved in that action. There are other questions relating to why it was done. They didn't go off. They did not go off. But they could have gone off. There was some contest about that as to whether they had been defused, because there were messages that were contained inside the bomb material. But I think that's probably irrelevant to this case, because we're not contesting the probable cause issue. You make a big deal out of it, though. Well, it is significant. There are things that are properly wired. They were not the kind of things you buy at a joke shop. No, they're not. They say, bang. You know, that's how a flag comes out and says, bang. They're the kind of things that, if properly wired and detonated, would make a big hole in the ground. Exactly. Kill a lot of people. The information that I have is this was a device, two devices in backpacks, consisting of ANFO, ammonium nitrate fuel oil, a combination. Not the kind of thing that lets you take on a plane. Exactly. It's not something you take on a plane. The date, however, is significant, because June the 19th is the date celebrating the anniversary of the creation of the government of South Vietnam's army, a date that has been celebrated for a long time by people in South Vietnam. Hence, there is a message component to that particular date, which would be something that would be aware. The people in the communist government of Vietnam would be aware of the significance of that particular package at that particular time. Using duck bombs is a. Pardon? Using duck bombs is a. I think it would be the equivalent of letting somebody know that there was a possibility that a bomb could be exploded at that particular site. Mr. Vo, I should say, his name was not initially VanDuck Vo. His real name is Nguyen, but he used the name VanDuck Vo and has because they stand for knowledge, morality and bravery. And he is a Buddhist. And so that is one reason why it appears that he was not in a position where he wanted to have this bomb actually explode. But let me get to the point that I would like to make in this case, and that is that the lower court misinterpreted and unduly restricted the scope of the political offense exception to extradition in this case. We're not the case before us. It doesn't really matter whether the bomb was one that could have gone off or couldn't. That's not the issue. The only issue here is whether if this was a bomb or not, it meets the grounds for extradition or the political offense exception. So the only issue for us is whether this was a political offense under the doctrine of a political offense. Exactly, Your Honor. And that, of course, brings us to the Quinn versus Robinson case, which the Court is very well familiar with. And I would like to talk about this because under the relative political offense portion of Quinn versus Robinson, it would appear that this is a situation where Article III of the treaty has been met, that this is a political offense. The incident test requires that there be an incident to or uprising and uprising prong that be examined. Looking at the uprising prong, the magistrate judge in this case determined that because Ho was essentially a U.S. citizen and the embassy was in Thailand, that the components of the uprising prong were not met. Well, let's take the second one first. Doesn't it have to occur within the country under Quinn? Under Quinn, it would seem that that would be the case for the most part. But if the Court were to look at page 807 of Quinn, it does say that it need not be a general rule, that some circumstances might present themselves which would be exceptional. I would suggest that this is a case that would be exceptional in that an embassy is recognized as a place where there will be personnel from a particular State, that people would go to that for dealings with that State, that it represents that particular State. So there is a difference. And I would say that under the law, and there was a concurring opinion, as I recall, in the Quinn decision which also mentioned that we may not have to be so specific because there are going to be differences that come up in so far as the legal process. Well, one of the differences was in Quinn itself where there was a question about what do you consider to be the country. But that isn't what I understand the paragraph that you're citing in Quinn says. It doesn't say that if it's in fact just a completely different country, that that doesn't make it not an uprising. It seems to be saying instead that there may be some issues about, you know, when it is a different country. Here it was a different country, was it not? It was in Thailand, but it was the Vietnamese embassy where the packages were placed on that land of the embassy. The whole point of Quinn was to distinguish between an uprising in a country where there was a revolutionary movement by the people in the country and what went on in that country as opposed clearly on numerous occasions to terrorism exported to other neutral countries and spreading the war internationally. That was the line, it seemed to me, that we were drawing in Quinn. There was a line that was drawn. What I'm asking essentially is that the Court consider that language in Quinn. Well, which is where officers of Quinn had done a better job. That there be an embassy exception engrafted into that because it is so specific. It is such a specific entity. I would ask that. Let me ask you about the uprising part. I'll hear more to say on this point. I mean, let's say we get past the location part. What evidence is of an uprising? The evidence of the uprising as supported in existence. I mean, there seems to be, in fact, evidence going the other way, that all the locations are supposed to be a peaceful protest, that it's in the future. I don't know of any evidence of an uprising. Well, there have been continuous acts that have been taking place over a number of years regarding the government of Vietnam, actions that involve the people from the government of Free Vietnam having soldiers who were imprisoned for their actions, actions that have been taken against people in Vietnam, people who were protesting for freedom of religion, were protesting for other rights that they didn't receive, people who actually, within two months of this date... Well, look, I understand that there were acts of oppression. I mean, there's, after all, a communist regime known as being oppressive, but the fact that there's oppression going on is very different from an uprising. I mean, there was oppression going on throughout Eastern Europe between, say, 1945 or 47 until the late 1980s, more or less when the Berlin Wall came down, and yet one would not say that Eastern Europe was a hotbed of uprising. There was an uprising in Hungary in 1957, there was an uprising in Czechoslovakia in 1968, thank you for this person, in 1968, but there was not an uprising generally in Eastern Europe, even though, let's say, take a place like Romania, it was well known for being highly oppressive, but there was no uprising going on. I mean, those are different concepts. What do we have here that suggests an uprising? Well, there were members of the Buddhist faith who were monks who self-immolated themselves. There was one whose name is... Where? In Vietnam, whose name is, if I can pronounce it, Thich Quang Do, who is the most prominent of the Buddhist monks, who was arrested and disallowed from the practice of his religion. He was put in a position where a lot of the Buddhists were told that they had to incorporate Ho Chi Minh into their religion as a religious figure, when it's not part of their religion. There were Montagnard uprisings in the area where people were killed within about a two-month period prior to this for asking for certain freedoms and for expressing some right to maintain property. Also at the same, just within a couple of months after that, the June event, the United States House of Representatives, by a 410-to-1 vote, condemned the government of Vietnam as being oppressive and a huge civil rights, human rights violator.   And I think it's a question we should have a discussion about. But you're just not responding to Judge Kaczynski's question, which is all of this demonstrates that there was oppression, but how does it demonstrate there was an uprising? Well, the actions of the people, I believe, do. Now, you can have actions of people who protest, like Gandhi did, who could be not violent. It would seem that a person could act in a way, and I think of lunch counters, sit-ins and things like that, that would be violative of law, would result in violence, perhaps by people acting against them because they were acting nonviolently, going to jail, putting people in prisons and rehabilitations and relearning camps, which is what happens in Vietnam, is a violent act. The nonviolent act generated violence. That should be sufficient to comport with the level of violence requirement. What about this citizen business? There's no doubt on the record that Mr. Vo is a United States citizen. You don't dispute that, right? I do not dispute the fact that he's a United States citizen. You claim that he is nonetheless also a citizen of Vietnam, and other than your own statement in your brief, I haven't seen anything on the record to show that to be the case. Maybe I missed it. Well, there was something. I mentioned that to the Court. The magistrate judge, it's on page 14 of the transcript, that Vietnam recognized Vo as a Vietnamese citizen. Transcript of what? The hearing in front of Magistrate Judge Nakazato. So that's you speaking? That was me speaking, but I also had – Are you a witness? Were you on the oath at the time? There was a document from the – a representative from the government of Vietnam also claiming that Vo was still and will always remain a Vietnamese citizen. So when you say the government of Vietnam, you mean the current government of Vietnam? Yes, I do. And he was there in the courtroom? He wasn't in the courtroom, but because this is an extradition proceeding, the rules of evidence don't apply from the standpoint of hearsay information for both sides, assuming that it operates equally. Well, where was he? It was off the Internet. Is his statement in the record? I believe it's in the record. Who put it in the record? I believe I put it in the record. You can't just sort of put things in the record. The Court has to admit them. Well, the Court admitted all the defense exhibits. They were admitted at the beginning of this hearing. Well, that's what our – this was an exhibit offered by the exhibit. It was an exhibit, yes. How do we know this was not some kid in Kansas pretending to be the government of North Vietnam, of whatever, of Vietnam? Well, I understand. I mean, I understand it could have happened. Stranger things have happened. But the thing I would point out – I mean, was there an authentication of some sort when you put it in? Or you just admitted an exhibit? And do you know where it is? Is it in an excerpt? I don't. I can't tell the Court right now. I can look for it and advise the Court later if I – if I could have that opportunity, because there are so many – there are stacks of exhibits. It wasn't cited in your brief. Pardon? It was not cited in your brief. I don't know if I cited that in my brief. I can't tell you. But as far as we're concerned, the evidence, if there's any evidence at all, of dual citizenship is very thin. There's certainly no finding by the magistrate. Did you ask a magistrate judge to make a finding on dual citizenship? Well, there is also in the Court record a statement – this is on page 48 where the Court is considering. Page 48 of what? Of the hearing in front of Magistrate Nakasada. And where is that in the excerpts? That's – I don't know exactly which excerpt. You have excerpts right there. I do. You know, I could take the time and look right now. Yeah, go ahead. Take the time. Why don't we save it for rebuttal? Maybe we should save it for rebuttal then. I thought you would be prepared coming to court this morning. I'm sorry about that, Your Honor. I apologize. And I will give you an opportunity. You only have four minutes left. I understand. And I wanted to – What were you saying? What was there to find on page 14 of the transcript? Well, the judge was recognizing that there was dual citizenship possible. If he has dual citizenship, he talks about it, and he does have some – the judge says he does have some family members that are still in Vietnam. Now, here we have Iraqis who are voting in the Iraqi election, even though they may be U.S. citizens, and we're encouraging them to do that in opposition to a repressive regime. So there are some reasons to believe people can be dual citizens and exercise their rights against a country they formerly were residing in. I'd like to turn, if I could, quickly, though, to – Does the voice plan to go back when the regime changes? Is that what he's saying? I'm not saying that he plans to go back. I don't know. I can't answer that question. Well, what kind of involvement does he have? I mean, if he's a U.S. citizen getting involved in an uprising – assuming there is an uprising in a country where he does not plan to go back, as to where his citizenship, if it exists at all, is highly questionable, I mean, how is that any different than having him pick some other country? Let's say, you know, there's lots of uprisings all over the world. Well, he was a U.S. citizen after he was a Vietnamese citizen, born and raised in Vietnam, has relatives in Vietnam, friends in Vietnam, has substantial connections as do a lot of people, many of whom are here today, with Vietnam, even though they have subsequently moved from that repressive regime to the United States. I would like to, in my remaining time here, if I might, touch on the other issue, which is that Article V, Clause 2 of the extradition treaty provides that extradition may be denied when the person sought is being or has been proceeded against in the requested state for the offense for which extradition is required. Why isn't that question simply beyond the habeas? Leaving aside whether it's beyond the authority of the magistrate judge at all, my understanding is the habeas in particular is limited to the questions of identity, jurisdiction, and probable cause, and nothing else. And whether it's an extraditable offense, but nothing else. Is that right? The Court has a right and a duty to determine what the language of the treaty says. I thought we had case law that said what I just said as to the scope of that duty on habeas. It's a very strange scheme because there's no direct appeal from the magistrate judge. There's simply a habeas. And the habeas, by case law, I gather, not by statute, seems to have this limited role. And if that's the limited role, then I don't see, even if the magistrate judge would have had authority at least to interpret the language without making the decision, I don't see how he could do it on habeas. Well, if, as we know, the treaty is the supreme law of the land and it has to be interpreted, then the courts are the appropriate. I understand that. I'm suggesting that perhaps the magistrate judge on the extradition, direct extradition proceeding, could have done it. But that's not where we are now. We're on a habeas. For us, it's just a hypothetical question which we're not allowed to answer because it is purely advisory. All we'd be saying is, Madam Secretary of State, you can choose not to extradite because he's been proceeded against. Magistrate judge can do it because he's an Article I judge and he's not barred from giving advice. That's why we have magistrate judges doing these hearings. But we can't give advisory opinions like that, can we? Well, it would be the interpretation that I would make, and, of course, I'm not sitting up on the bench, that there would be, in connection with a treaty, a need to determine what proceeded against Med, just as much as it would be necessary to determine what probable cause is. Magistrate can make that determination. In this case, the government filed a case against Med.  case because it does not have the careful determination they need in this case. Yeah. Now, judge Kuczynski and judge Berzonna are suggesting that if the magistrate can make that determination, maybe he can, that it may not be reviewable and habeas. Does that mean it's unreviewable entirely, or? I don't think it's unreviewable entirely. To say that that's unreviewable would mean that the only construction of any treaty would then rest in the executive's hands. Not the only. The ones that don't come within the categories of issues that we have authority over and habeas. But then if these courts, the courts can't address that issue, what is to protect a citizen who is put in a position where a judge says, I don't think I have authority to do it. In this case, on page 44 and 45, Judge Nakazato and the United States attorney both say they don't really know what proceeded against means in that treaty. But there's a need to define that. Maybe it's not the right of the individual. Maybe it's simply a way out for the States, so the government can choose not to expedite in explaining to its treaty partner why it's not expediting, saying, oh, well, the reason we're not expediting is because we are proceeding against the individual. It may simply not be an individual right. Not everything in the treaty creates individual rights, and this may be one of those things it doesn't. But it would seem if part of it is determined probable cause, that would be consistent. You do agree that ultimately, even if there's a finding, even if somehow the magistrate has made a finding of that Mr. Voe had been proceeded against, there's nothing the magistrate judge or we could do to force or to preclude expedition on that basis. At most, that would be a predicate for the exercise of discretion by the Secretary of State. It could be that she could say, yep, he's been proceeded against, but I'm going to expedite him anyway. She still may say that. She still may say that. She still may say that. She may say that there was insufficient probable cause. Was there an actual dispute about the meaning of that term in the before the magistrate? Did the government say your client had not been proceeded against? The government said, I suppose, proceeded against could imply proceeded against to conclusion, or it could apply, imply the contrary, an initial proceeding that did not go to conclusion. I don't think that there is a way to say for sure. That was what the government said. The government took no position on the meaning of the term. They said they didn't know what it meant. So we don't really know whether there's a problem until we see what the Secretary of State says. But about that time, it's a little late for Mr. Boe if it turns out that the treaty should not have been enforced because the statute doesn't say that. It doesn't say it should not have been enforced. At best, it says that it may not. It is possible not to enforce it. It's possible. I agree. It's possible. It's possible not to enforce it anyway, isn't it? Isn't it discretionary with the Secretary of State in any event? The Secretary of State's actions are discretionary, but the Secretary of State relies on information supplied by the Court about whether there was probable cause, whether other terms and conditions of the active treaty are in effect and have been complied with, that would be information that a court should supply to the executive branch. Thank you, counsel. Thank you. May it please the Court, my name is Daniel Goodman, and I represent the Respondent, Michael Benov-Borden. Your Honors, I have no prepared remarks today.     I'm here to answer any questions you may have. I'm here to answer the Court's questions. The Embassy is territory of the State that sets up the Embassy, isn't it? Your Honor, the Embassy is the territory of the receiving State rather than the sending State. It is true that both the receiving State and the receiving State are the same territory. Well, let's test that. Let's say somebody commits a bank robbery at 16th and K Street in Washington, D.C., and then as the police are chasing him, runs down to the Russian Embassy, which used to be right there on 16th Street. Maybe it's moved since then, but assuming it's still there. Runs through the gate and runs into the Embassy, runs past the guards and hides inside. Can the police go in there and catch him? No, Your Honor. How do you get him out? How do you get that guy, that individual out of the Embassy? If you're, you know, the Washington, D.C. wants to prosecute him, the United States wants to prosecute him for a bank robbery. How do you get him out of the Embassy? I think you request the Embassy authorities to expel him. I think it's called extradite. I think that's the term you're looking for. It's just like being in Russia. It's just like being in another country. If you are in the Embassy, the only way to get somebody out of an Embassy is by extradition. You have to go through the whole process. So why isn't this bomb set at the Embassy, of Vietnamese Embassy in Thailand, fall squarely within the incidents in the sense that it is directed at the territory of Vietnam,  I think it goes back to the purposes of the political offense exception. One of the purposes is to prevent people from being returned, individuals, unsuccessful rebels in particular, from being returned to a country that is obviously antagonistic to them. In this case, because it is the Thai authorities that are seeking the extradition of Mr. Vo, based upon conduct on Thai territory, that purpose for having a political offense exception would not apply. So I think when we ask where the offense … But let's say there were an uprising, and we can talk about whether there was an uprising. There was a revolution in the streets of Ho Chi Minh City. People are rioting and so on. And then somebody decides to attack the Embassy in Thailand, or let's say that Vietnam has an aircraft carrier somewhere, or some big ship somewhere. And they go decide to bomb the ship. I mean, let's say it's out in the open sea. It's not in Vietnamese territory. Well, I don't even know if Vietnam has a navy. I assume they do. I just … I assume … But let's say they have a ship somewhere that's in the middle of the Pacific Ocean. And somebody, let's say, airplane, a private airplane, and drops a bomb on the deck of the ship. Would there be any doubt that that would be incident to an uprising? I mean, I'm assuming these were not criminals. I'm assuming these were people connected with trying to overthrow the government. I mean, the fact that it doesn't happen to be within the territorial borders of Vietnam wouldn't make a difference, would it? It certainly could be incidental. In one sense, it's incidental to the uprising. The question is whether it is so in a manner that the courts will choose to acknowledge in applying … Suppose you blew up the Romanian embassy in Washington. Oh, no. It's not a bad idea. If you blew up the Romanian embassy in Washington, would that be an offense against any American law? And would it occur within the United States? I think the answer is yes and yes. What part of what would the American violation be? The court is getting into an area that I'm not very familiar with. Does any of the crime take place on American territory, even if you blow up an embassy of another country? Oh, as a factual matter, it might be that there was conduct that took place prior to reaching the embassy. But even if there was not, even if the crime was confined to embassy territory, I think the United States would have concurrent territorial jurisdiction to prosecute that offense, probably under one of the bombing statutes that we have. I don't know the citation, possibly 2332 or a weapons of mass destruction statute. I do believe that there would be U.S. territorial jurisdiction to prosecute that offense. But what exactly happened here? My understanding is that there was one bomb that was thrown into the embassy and another one that was outside the embassy? There were two bombs. One was a backpack. It was placed against the front gate. The other was a cardboard box. It was thrown over the fence. So the one that was in the front gate under Judge Kaczynski's hypothetical wasn't in the embassy, and presumably if some guy was out there, he wouldn't have to be extradited. Under Judge Kaczynski's hypothetical, I suppose it depends on what the embassy grounds consist of. I just don't know the answer to that. But also there were – It wouldn't much matter whether it's actually on the embassy or whether you set a blast off away from the embassy that's designed to damage the embassy. Even a bomb inside the embassy is also inside of Thailand. So anything that happens in the embassy necessarily happens within the country, the receiving country. Absolutely. But that doesn't answer the question of whether it's also incident to an uprising because it affects and the strict treating of Quynh because it in fact affects – it's on the territory or affects the territory of the country that's having the uprising. But what if it affects both countries? If you blow up an embassy with a bomb placed on the outside, the force of the bomb will affect the territory of Vietnam and the territory of Thailand. What does that do under Quynh? Assuming it is directed at the territory of Vietnam, but it also necessarily affects the territory of Thailand, is that covered by the political offense exception or not? I think it would not be a political offense. I have two – It could have been written better. Maybe we don't know. Well, we don't answer hypothetical questions. We wait for the next case, which we've done. Indeed. I have two levels of responses. One, I do not think – I still do not think that the Vietnamese embassy is the territory of Vietnam. We're assuming that for the moment. We're assuming that. I agree with Judge Kaczynski that this issue that we're debating now does not definitively answer the question of whether it is incidental to. I think in order to answer that question in terms of the second prong – I can give you the flip side hypothetical. Let's say the uprising is happening in Ho Chi Minh City and somebody sets a bomb in Ho Chi Minh City and it happens to be close to the Thai embassy and thereby destroys part of the wall of the Thai embassy, right? But it's inside of Vietnam, right? Yes. It affects both territories of both countries. Yes. I mean, the two cases shouldn't be treated any differently, should they? Well, it depends. I mean, the fact that another country's territory or citizens or interests are affected by violence incident to an uprising does not – shouldn't change – shouldn't affect the question of whether it is incidental to an uprising. Not unless you accept the basic premise of Quinn, that we're trying to contain the revolutionary activity and that the purpose is to stop the spread of international terrorism and to limit it to the jurisdiction of the country where the uprising occurs. Then you might reach a different answer in that hypothetical. Although you might say that if it's a territory like an embassy or a battleship or something of that sort, there are small enough pieces of the country. Yes. You might or you might not. All right. Okay. All right. If the Court has no further questions, I'll make one. I do have a further question, which has to do with the habeas jurisdiction question I asked earlier. Where from whence comes the – and where do they appear, the limitations on habeas jurisdiction? And are they, in fact, more limited than what the magistrate judge can do directly? Thank you. Is there an area of unreviewable authority in the magistrate judge? That's really what I'm asking. Oh, certainly. Absolutely, Your Honor. I think most, if not all, procedural steps that the magistrate judge takes are unreviewable on habeas. The source of that tripartite system where the habeas court may review matters of jurisdiction, number one, matters of the treaty, number two, and probable cause, number three. What do you mean matters of the treaty? If it was matters of the treaty, then I'm wrong and we couldn't review this. The review – I don't think it said that. It says – the language comes from a case called Fernandez, a 1925 Supreme Court case originally. And it says – I think the terminology is whether the offense falls within a valid treaty. Whether the offense falls within a valid treaty. And there are some cases – Not generally interpretations of the treaty. Correct. Correct. Not that broad. And those go back in extradition law, at least to this case, Fernandez, 1925. They've been repeated since. In the Ninth Circuit, I think there's a case called Hooker v. Klein, which talks about it. There are many cases that have that three-part or sometimes it's broken up into five-part system. Let's say that a Secretary of State thought proceeded against has no meaning whatsoever. And it was clearly, as a matter of law, wrong. Would there be any place, any role for the Court? And how would a Court say, no, this is what the treaty means? There would be no role for the Court. So if the – imagine if the Secretary of State was asked to address this question and she put out a document that said, I'm sorry, but I don't have the authority not to extradite Mr. Vo on this ground because proceeded against means that you have to go to completion, not simply in media race. When that seems to me, I can tell you, to be plainly wrong because there is a provision with regard to completed proceedings and another one with regard to instituted proceedings, and this clearly has to mean something in the middle, then he would have no recourse. No Court could ever consider that question. Yes. That's correct, Your Honor. And the reason is that the – the judicial – And I suppose she also said, and if I had the authority, I'd do it. I would not extradite him if I thought I had the authority, but as I read this, I simply don't. Sorry. It's an interesting hypothetical, and I am going to address the hypothetical. I would note before I do that the Secretary of State doesn't speak in those terms. We would never, I think, find a situation where the Secretary of State gave that kind of judicial-sounding analysis that the Court could look at. But even if the Secretary of State did precisely that, it is the government's position that there is no judicial review of the Secretary of State's extradition decisions unless, I think there's a hypothetical case where a statute would provide for that judicial review. But here there is no judicial review. And the reason is exactly what Your Honor stated in the Blacksland case, which is that the extradition process has a small judicial role and a much larger, indeed plenary, executive role. And expanding the judicial role threatens the ethos of the extradition system. And in particular, it would be, I think it would be an advisory decision if the courts were to, before the Secretary of State makes a decision, say what proceeded against means. Not before. Any time. The question is not limited to before. Suppose the Secretary of State said, I'm going to extradite somebody under this treaty. And in fact, the treaty had never been ratified by the Senate. Would there be any judicial role in that case? I think, yes. I think the judicial role would come before the Secretary of State's decision because it could not have gotten to the Secretary of State absent the judiciary saying that there was a valid theory, a valid treaty. Valid treaty. Valid treaty. And could we say the treaty does not provide for extradition? The Secretary of State says, I read the extradition clause into this treaty. By implication. Could the Court say there is no extradition clause? Well, I think the Court would necessarily be saying that. What would happen is somebody would be brought into court, there would be an extradition hearing, and the government would have to point, as it did in this case, to the extradition treaty. And if this clause said you cannot extradite if the person has been preceded against, we could then decide what preceded against meant? If that decision was given to the judiciary, as is the first prong of this Article 3, excuse me, Article 5 that we've been discussing, we've been discussing Clause 2 of Article 5, there's Clause 1 of Article 5, which says if a person has been acquitted or convicted, that person cannot be extradited. And that is proper for judicial interpretation, because that is a definite standard or rule. Including unhabeas. Including unhabeas. It's probably an aspect of whether there's an extraditable offense. I think that's right. Whether the crime falls within the treaty, it probably does. Yes, it probably does, Your Honor, in that context. I agree. Mr. Goodman, in the rude brief, Mr. Mayock makes a statement at least once, maybe more than once, about how if the petitioner is extradited to Thailand, he'll be then whisked away to Vietnam, or he'll be shot. I take it your position is under the doctrine of specialty that could not happen? Or is there some guarantee that our government has that that will not, in fact, happen? Well, of course, the doctrine of specialty doesn't say it cannot happen. The doctrine of specialty only says it would be illegal for it to happen. Article 14 of the treaty, which embodies the doctrine of specialty, says that it would be a violation of the treaty if Thailand were to do that. I think there's no reason on this record to suppose that Thailand will violate its treaty with the United States in this instance. But we don't know one way or the other. We haven't, so far as you know, our government has not sought any assurances on this point. No, the time would not be right for that. The Secretary of State commonly, well, sometimes seeks assurances at the time a surrender warrant is issued, but we haven't reached that stage. I know that other countries seek assurances from us, for example, that we will not impose a death penalty if a prisoner is surrendered to us, is extradited to us. Yes, that's an executive function. And I think we're getting into, we're getting close to the, we're getting into the doctrine of non-inquiry at this point, which is the principle that. It doesn't prevent us from asking questions. It doesn't prevent the Court of inquiring of me, that's for sure. Good. Okay. But the notion that the courts will not look at the justice system of the requesting country, the conditions of imprisonment or the legal system, and here what we have is a treaty that says neither treaty partner may re-extradite a person to a third country. And I think to second-guess that would devalue the Court's role. Thank you, counsel. Thank you. Okay. If I might just have a moment to answer the Court's questions. Exhibit 53 is the transcript that I was referencing. Exhibit 53, this is tab 53? This tab is 53. Okay. And what page are you looking at now? I wasn't looking at anyone. I was just giving the Court that information. I'd given it to you. Well, I don't remember what the question is you were answering. Just give me an exhibit number that doesn't ---- The question was ---- As I recall, you were talking about page 14 or something, in connection with some answer to some question. I was ---- I think I asked you ---- On page 48, I talked about the Court's ---- 48. ----recognizing dual citizenship as an issue. And ---- I'm sorry. Where on page 48? At the top of the page, if he has dual citizenship. Do you have a line number? Yes. Line 1. If he has dual citizenship. Is that a finding? No. It just didn't recognize that he has dual citizenship. It starts with an if. You never wrote that there was a finding, did you? Pardon? You never told us there was a finding, did you? You did not say to us there was a finding? No. No, he did not make it. I actually asked you whether you had requested the magistrate to make a finding, and in answer to that, you directed me to page 48 of the transcript. The Court essentially in its order stated it didn't feel it had the power. I would, if I could, add one thing going back to the ---- I'm sorry. The Court said it doesn't have the power to determine whether he's a dual citizen? The Court concluded that he was a U.S. citizen. He was. But didn't really go into the issue of whether he was a dual citizen. Did you ask the Court to make a finding on that score? We argued the case, and then I think it was 16 or so months later we received a written opinion. So much time had passed, I couldn't recall anything specific about what was said. I don't know if I asked specifically for that finding. I do know that the Court was waiting for the Barapin decision to come down from the circuit and held the opinion for a long time. But you were going to tell us where in the record there's evidence that there was dual citizenship. That was the other thing you were going to look up. That was the statement from the Internet, right? I believe so. And I didn't see that in looking quickly through the 50 or so pages and the two volumes that we had. I did find something as I was going through from the Ligat in Bangkok with respect to a question you asked the government counsel. It says that with respect to whether Vo would be released to Vietnam if he were to be extradited, we doubt that the RTP is the final authority on such a promise. One thing for sure, there will certainly be lots of pressure from the Vietnamese to do just that if he ends up back here. What's the RTP? That would be the Royal Thai Ministry is my understanding of some sort. They are the prime minister of Thailand would be the person who would be the ultimate contact that would make a decision, I guess, with respect to a Vietnam extradition request. And lastly, I'd say, as I know I'd take more time, I probably should, that there were 7,500 petitions supporting Mr. Vo, a sample of which is Exhibit 17 and 18 is a master list of all those people. So this was not just a venture without any support or encouragement that he entered upon. Thank you. Thank you. Thank you both very much. The case is arguably submitted. The Court will take a brief recess before hearing the final cases of the morning. Thank you very much. The Court stands in recess.
judges: Reinhardt, Kozinski, Berzon